# UNITED STATES DISTRICT COURT

# DISTRICT OF ALASKA

| | |
|---|---|
| CAPITOL SPECIALTY INSURANCE CORPORATION, | )<br>)<br>) |
| Plaintiff, | )<br>) 3:20-CV-00029-JWS |
| vs. | )<br>) ORDER AND OPINION |
| ADAM KANGAS AND DAVID K. BROWNE, | ) [Re: Doc. 16]<br>)<br>) |
| Defendants. | )<br>) |

## I. MOTION PRESENTED

At docket 16 Plaintiff Capitol Specialty Insurance Corporation ("Capitol") filed a motion for summary judgment as to its declaratory judgment action against Defendants Adam Kangas ("Kangas") and David K. Browne ("Browne"). In this action, Capitol asks the court to declare that the claims asserted against Browne by Kangas in the underlying state court complaint are not covered under the commercial general liability insurance policy it issued to Browne—CapSpeciality Policy No. CS02855616-01 (the "Policy")—and that it has no duty to defend Browne against the claims asserted by Kangas or to indemnify Browne for any sums he becomes legally obligated to pay to Kangas. Browne opposes the motion for summary judgment at docket 24. Kangas joined the opposition at docket 34. Capitol replied at docket 41. Oral argument would not be of assistance to the court.

-1-

## II. BACKGROUND

Browne owns property located on Totem Road in Anchorage, Alaska ("Property"). He decided to build a new home on the Property and to act as the contractor of the project. In connection with the construction project, he obtained the Policy after consulting with his insurance agents, WIN Group and Brown & Riding. He did not purchase any additional type of insurance policy. He hired Rob Tingstrom ("Tingstrom") to frame the structure. Browne and Tingstrom verbally agreed that Tingstrom would pick laborers to help with the framing but any hires would have to be approved by Browne.[1]

On February 8, 2018, Kangas was injured on the Property when a steel beam fell from a fork lift as it was being lowered to the ground.[2] Kangas alleges he was working on site and had been working there for a few days prior to the accident.[3]

Kangas learned about the job through Tingstrom.[4] The two had worked together at CH2M Hill.[5] Kangas believed that Browne had approved him to work on the Property and that he would be paid $20 per hour "under the table."[6] After the accident, while Kangas was in the hospital, Tingstrom gave Kangas $160 in cash as payment for the hours worked.[7]

Kangas filed a complaint for damages against Browne in state court. He alleges that as a proximate result of various negligent acts or omissions by Browne, he

---

[1] Doc. 16-2 at p. 3-4 (Browne depo. at pp. 12-14, 19).

[2] Doc. 1-3 at ¶¶ 11; doc. 21 at p. 5 (Kangas depo. at pp. 63-64).

[3] Doc. 1-3 at ¶¶ 11, 16.c; doc. 21 at pp. 3-5 (Kangas depo. at pp. 53-64).

[4] Doc. 21 at pp. 2-3 (Kangas depo. at pp. 46-47, 49-51).

[5] Doc. 21 at p. 2 (Kangas depo. at p. 46).

[6] Doc. 21 at p. 3 (Kangas depo. at p. 50).

[7] Doc. 21 at p.4 (Kangas depo. at pp. 55-56).

-2-

sustained "severe and permanent injuries" after being struck while "working to assist in the placement of a heavy steel beam."[8] Browne tendered defense of the underlying complaint to Capitol. Capitol agreed to pay the reasonable costs of the defense of the underlying complaint subject to a full reservation of rights to disclaim any duty to defend or indemnify Browne. This declaratory judgment action followed. Capitol believes that Kangas's claims against Brown in the underlying state complaint are excluded from the Policy's coverage.

## III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9] The materiality requirement ensures that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[10] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[11] However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[12]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[13] Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute

---

[8]Doc. 1-3.

[9]Fed. R. Civ. P. 56(a).

[10]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[11]*Id.*

[12]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[13]*Id.* at 323.

-3-

as to material fact.[14]  Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[15]  All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[16]  However, the non-moving party may not rest upon mere allegations or denials but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[17]

## IV.  DISCUSSION

Under Alaska law, the interpretation of contract language is a question of law.[18]  Insurance contracts are interpreted by looking to (1) the language of the disputed provisions; (2) other provisions in the policy; (3) extrinsic evidence; and (4) case law interpreting similar provisions.[19]  "Insurance contracts are interpreted in accordance with the reasonable expectations of the insured" and are construed according to "ordinary and customary usage."[20]  Ambiguous terms are to be construed in favor of the insured.  However, ambiguity exists "only when the contract, taken as a whole, is *reasonably* subject to differing interpretations."[21]

---

[14]*Id.* at 323-25.

[15]*Anderson,* 477 U.S. at 248-49.

[16]*Id.* at 255.

[17]*Id.* at 248-49.

[18]*Dugan v. Atlanta Cas. Cos.*, 113 P.3d 652, 654 (Alaska 2005).

[19]*Id.; see also Hahn v. GEICO Choice Ins. Co.*, 420 P.3d 1160, 1170-71 (Alaska 2018).

[20]*Hahn*, 420 P.3d at 1170-71 (internal quotation marks omitted).

[21]*Dugan*, 113 P.3d at 654 (quoting *Modern Constr., Inc. v. Barce, Inc.*, 557 P.2d 528, 529 (Alaska 1976)).

Here, the outcome of Capitol's declaratory judgment request turns less on the interpretation of the Policy's provisions and more on the underlying facts. Capitol asserts that Kangas's underlying complaint alleges and the uncontested facts show that he was working on the Property at the time of his injury and that various exclusions in the Policy make clear that it does not cover work-place injuries. Capitol relies on the following exclusions:

> 1) **Employer liability exclusion.** The insurance does not apply to "[b]odily injury, personal injury, or advertising injury to . . . [a]n employee of any insured arising out of and in the course of employment" and the exclusion applies: "[w]hether an insured may be liable as an employer or in any other capacity." The exclusion states that for its purposes "the term 'employee' includes loaned, rented, leased or temporary employees, as well as person who qualify as borrowed servants or employees or persons who are or may be deemed employees of any insured under the doctrines of borrowed servant, borrowed employee, respondent superior or any similar doctrine, or for whom any insured maybe held liable as an employer."[22]
>
> 2) **Workers' compensation exclusion.** The insurance does not apply to "[a]ny obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law."[23]
>
> 3) **Non-employee labor exclusion.** The insurance does not apply to "'bodily injury'. . . or medical expenses for, any person who participates in the course of work performed by you, who is not employed, subcontracted or being compensated in any way by you."[24]
>
> 4) **Contracted persons exclusion.** The insurance does not apply to "'bodily injury' . . . or medical expense sustained by any person who is: (a) [c]ontracted with you or with any insured for services; or (b)[e]mployed by, leased to or contracted with any entity that is: (c) [c]ontracted with you or with any insured for services; or (d) [c]ontracted with others on your behalf for services.[25]
>
> 5) **Independent contractor exclusion.** The insurance does not apply to bodily injury to "[a]ny independent contractor or the 'employee' of any independent contractor while such independent contractor or their

---

[22]Doc. 1-1 at p. 75 (Policy, Third-Party-Over Action Exclusion- CGL 399 (06-11)).

[23]Doc. 1-1 at p. 38 (Policy, CGL Coverage Form Section I Coverage A 2.d).

[24]Doc. 1-1 at p. 35 (Policy, Amendatory Endorsement–Contractors, ¶ B.5).

[25]Doc. 1-1 at p. 35 (Policy, Amendatory Endorsement–Contractors, ¶ B.6).

'employee' is working on behalf of any insured" and it applies "[w]hether the insured may be liable as an employer or in any other capacity."[26]

Browne denies that Kangas was his employee and working for him. He relies on his affidavit, which states that he never hired Kangas or agreed to hire Kangas, that he was never told that Kangas was working on the site, that he never directed Kangas's work on site, and that he never paid him or directed someone else to pay him.[27] He also relies on the affidavit of his daughter, Taryn Byrd, which supports his assertion that Kangas was never put on payroll or given a check or cash for his work.[28] The fact there are questions as to Kangas's employment status in relation to Browne, does not preclude a finding in favor of Capitol. As outlined above, the Policy excludes coverage for bodily injury resulting from a variety of labor arrangements, including not only employees, but also non-employee laborers, contracted workers, and employees of contracted entities.

The uncontroverted testimony demonstrates that Kangas was working on Browne's construction project in some capacity. It is undisputed that Browne and Tingstrom agreed that Tingstrom would frame the structure on Browne's Property and would find laborers to complete the work subject to approval. Kangas testified that Tingstrom hired him to work on the framing project for $20 per hour on an "under the table" basis.[29] He believed he had been approved to work.[30] Tingstrom gave Kangas the address to the Property and Kangas testified that he drove there before his first day

---

[26] Doc. 1-1 at p. 58 (Policy Exclusion - Bodily Injury to Independent Contractors).

[27] Doc. 37 at ¶¶ 3-6.

[28] Doc. 38 at ¶¶ 3-4.

[29] Doc. 21 at p. 3 (Kangas depo. at p. 50).

[30] Doc. 21 at pp. 2-3 (Kangas depo at pp. 49-50).

-6-

of work to make sure he knew where to go ahead of time.[31] He testified that he worked about three days on the project before he was injured: on his first day of work, Kangas worked four hours cleaning and organizing the site; on his second day of work he helped raise steel beams and "prepped and welded plates on the bottom of the columns that were going to be the columns of his garage"; on his third day of work he welded plates on the steel beams, swept and shoveled the site, and helped cut lumber.[32] Kangas testified that Tingstrom directed his work.[33] On the day of the accident, he was assisting in the raising and lowering of a steel beam when it fell on him.[34] While in the hospital, Tingstrom paid Kangas $160 in cash for his hours worked.[35]

Browne does not put forth evidence to controvert any of this testimony. He was not present during this time frame, because he was working in northern Alaska at the time.[36] He does not submit contrary testimony from another person on site at the time. He does not contest that Tingstrom paid Kangas for his work.

Based on these uncontested facts, even if Kangas was not an employee of Browne, his injuries are not insured under the Policy's non-employee labor exclusion. Kangas "participate[d] in the course of work performed by [Browne] [and was] not employed, subcontracted or . . . compensated in any way by [Browne]."[37] That is, Browne was acting as the contractor for his new home and Kangas was performing part of that construction work at the time of his injury. Tingstrom later paid Kangas. Browne

---

[31] Doc. 21 at p. 3 (Kangas depo. at pp. 50, 51-53).

[32] Doc. 21 at p. 4 (Kangas depo. at pp. 54-56).

[33] Doc. 21 at p. 4 (Kangas depo. at p. 55).

[34] Doc. 21 at pp. 4-5 (Kangas depo. at pp. 57, 63-64).

[35] Doc. 21 at p. 4 (Kangas depo at pp. 55-56).

[36] Doc. 26-3 at p.3 (Browne depo. at p. 6).

[37] Doc. 1-1 at p. 35 (Policy, Amendatory Endorsement– Contractors, ¶ B.5).

argues that Kangas does not qualify as a non-employee laborer because Kangas was not a "volunteer worker" as that term is defined under the Policy.[38] The non-employee labor exclusion makes no mention of the defined term "volunteer worker." Rather, it excludes injuries to laborers participating in Browne's course of work—here, the house construction—but not paid by Browne himself.

Alternatively, based on Kangas's uncontested testimony, Kangas would at least be considered a contracted person under the Policy. Browne contracted with Tingstrom to frame the house. Tingstrom in turn arranged for Kangas to work on the framing. Tingstrom directed Kangas's work. Tingstrom paid Kangas for his work. Therefore, he qualifies as an employee of, or person contracted with, a contractor, Tingstrom, and his claims for injuries are excluded under the contracted person exclusion.

Browne acknowledges that if Kangas had been a non-employee laborer, contracted person, an employee of a contracted person, or a person contracted with the insured's contractor then his claims against Browne would not be covered under the Policy. However, he asserts that Kangas does not fall within those categories and his presence was more in line with that of a visitor or trespasser. The only evidence that Kangas may have been a visitor is contained within a medical record prepared by a doctor who treated Kangas. The medical record is dated February 9, 2018, and states in relevant part:

> 34 [year old] right handed male with history of hypertension and hearing loss who presents . . . after accident. History per patient and chart review. He states he was visiting some friends at their work on a construction site to see about potential work. They asked him to lend a hand for a few minutes and he agreed.[39]

Browne argues that the statement about Kangas's presence on the Property is admissible evidence under the exception to the hearsay rule set forth in Rule 803(4) of the Federal Rules of Evidence, which governs statements made for medical diagnosis

---

[38]Doc. 1-1 at p. 52 (Policy, CGL Coverage Form, Section V, ¶ 20).

[39]Doc. 26-8 at p. 1.

-8-

or treatment. The rules provide that a statement that is "made for–and is reasonably pertinent to–medical diagnosis or treatment" and "describes medical history; past or present symptoms or sensations; their inception; or their general cause" is not excluded by the rule against hearsay.[40] However, the statement within the medical record that Browne seeks to admit—that Kangas was on site visiting friends to see about potential work—is not reasonably pertinent to his medical diagnosis nor does it describe his medical history, symptoms, inception, or cause. Why he was at the construction site is not relevant to his diagnosis or treatment.[41] Moreover, there is no foundation for the statement that Kangas "was visiting some friends at their work on a construction site to see about potential work." This information is included in the narrative history portion of the medical record. The doctor's record states that he gathered such history from the patient and from "chart review." It is unclear whether the doctor's information about Kangas's purpose on the Property was obtained from the chart or from Kangas himself. Kangas testified at his deposition that Tingstrom and "a couple other guys" accompanied him to the hospital.[42] They could have provided that information to medical providers, which then ended up in Kangas's chart notes for the doctor to read. If that were the case, such a statement as to why Kangas was on the Property would be inadmissible hearsay. Browne has not established that it was Kangas himself who provided that information to the doctor.

There is no other admissible evidence provided to reasonably support the conclusion that Kangas was simply a visitor hoping to be hired. Browne provides no evidence to counter Kangas's assertion that Tingstrom hired him for the job, even if he

---

[40]Fed. R. Evid. 803(4).

[41]*U.S. v. Matta-Ballesteros*, 71 F.3d 754, 767 (9th Cir. 1995) (excluding a statement contained in a psychologist's report about the defendant's illiteracy because it was not made for the purposes of medical diagnosis or treatment and therefore defendant had no special incentive to be truthful).

[42]Doc. 41-2 at p. 12 (Kangas depo. at p. 76).

-9-

was not approved by Browne himself. He does not provide evidence to counter Kangas's testimony that he was working on the day of the accident and multiple days before the accident.

Browne also argues that Kangas could be classified as a trespasser on his property because he was not approved to be working on site. A "trespass is an unauthorized intrusion or invasion of another's land."[43] A person has not committed a trespass if he has consent to be on the land.[44] Consent may be granted by either the possessor of the land or a third party acting with the possessor's authority[45] and consent may be implied through actions, social conventions, or the relationship between the parties.[46]

The record supports a finding that Kangas had consent to be on Browne's Property. Kangas testified that on his first day of work he met Browne's daughter, Taryn Byrd, who also lived there, and that she shook his hand.[47] He testified that Tingstrom introduced him to her as a welder.[48] She does not dispute this testimony in her declaration. It is also undisputed that Browne was not on the Property during the days Kangas was working and that when he was gone Byrd and Tingstrom were in charge of the construction and that Byrd had the ultimate oversight responsibility for the project.[49] Taken together, this record does not reasonably support a finding that Kangas was trespassing at the time of the accident.

---

[43] *Lee v. Konrad*, 337 P.3d 510, 522 (Alaska 2014) (quoting *Mapco Express, Inc. v. Faulk*, 24 P.3d 531, 539 (Alaska 2001)).

[44] *Id.*

[45] Restatement (Second) of Torts §§ 158 cmt. c, 892A(2).

[46] *Lee*, 337 P.3d at 522.

[47] Doc. 41-2 at pp. 13-14 (Kangas depo. at pp. 141-142).

[48] *Id.*

[49] Doc. 41-3 at pp. 5, 6 (Browne depo. at pp. 17, 37-38).

A January 25, 2018 email to Browne from Tingstrom further supports the court's finding that Kangas was not merely a visitor or trespasser but a worker. The email names a handful of people and lists pay rates next to each person's name. On that list is "Adam Kangas" and the rate of pay next to his name was "$20.00hr. pos. Bonus."[50] Browne admits he received that email.[51] He admits that there was a discussion about hiring an "Adam" but that he was thinking of a different person named Adam that both he and Tingstrom knew from their line of work.[52] While Browne may have been confused as to who exactly would be on the Property working and while there still may be questions as to whether Kangas could be considered Browne's employee, it supports the conclusion that Tingstrom intended for Kangas to be working on the Property for pay and that Kangas was permitted to be there.

## V. CONCLUSION

Based on the preceding discussion, Capitol's motion for summary judgment at docket 16 is GRANTED. The court declares that the claims asserted against Browne in the underlying state court complaint filed by Kangas are not covered under the Policy. Capitol has no duty to defend or indemnify Browne in relation to the claims asserted by Kangas in the underlying state case.

DATED this 8th day of September 2020.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT

---

[50]Doc. 16-2 at pp. 10-11.

[51]Doc. 16-2 at pp. 5-6 (Browne depo. at pp. 44-45).

[52]Doc. 16-2 at p. 2 (Browne depo. at pp. 9-10).